UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 18-10167-GAO

ORLANDO JACQUET,
Plaintiff,

v.

CITY OF SOMERVILLE,
Defendant.

OPINION AND ORDER
June 30, 2020

O'TOOLE, S.D.J.

This is an employment discrimination lawsuit filed by the plaintiff, Orlando Jacquet, against his former employer, the City of Somerville. His complaint asserts claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. (Counts III and IV) and Massachusetts General Laws Chapter 151B (Counts I and II), and a claim for interference with the right to be free of discrimination in violation of Mass. Gen. Laws ch. 151B, § 4(4A) (Count V).[1] The action was removed to this Court pursuant to 28 U.S.C. § 1441. The City has moved for summary judgment, which Jacquet opposes.

## I.   **Factual Background**

The follow facts are undisputed unless otherwise noted:

Orlando Jacquet is a black man. He was sworn in as a patrol officer for the City of Somerville Police Department ("Department") and began training at the Lowell Police Academy in May 2015; he graduated in October 2015. After graduation, he was required to complete an

---

[1] The plaintiff has agreed to a stipulated dismissal of Count VI, a claim for intentional infliction of emotional distress.

eight-week Field Training Program ("FTP") with the Department. Successful completion of the FTP is based on satisfactory evaluations by the trainee's assigned Field Training Officer ("FTO") and superiors in the Department. During FTP, the new officer trainees rotate through multiple positions and are observed by the FTO and superior officers. The FTO is responsible for completion of Daily Observation Reports ("DOR") concerning the new officer's job performance.

During most of Jacquet's initial FTP, his assigned FTO was Officer Timothy Van Nostrand. He was also observed by Officer Ashley Cotado and Sergeant Diogo DeOliveira. Van Nostrand expressed concerns about Jacquet's performance to Sergeant DeOliveira, Van Nostrand's own direct supervisor, soon after the FTP began. Department records indicate that Van Nostrand, Cotado, and DeOliveira all observed Jacquet, and each independently expressed concerns with the his performance. Van Nostrand told DeOliveira that Jacquet "struggled with command presence, communication, officer safety, and simple form completion . . . showed hesitation, and timidness during stressful incidents which could negatively affect officer safety." (Aff. of Diogo DeOliveira, Ex. 4 at ¶6 (dkt. no. 42-4).) DeOliveira agreed that he had observed a "pattern of these concerns" in the DORs. (Id.) DeOliveria also personally observed Jacquet's performance and found him "extremely hesitant, unfocused, lacked command presence, and had trouble expressing himself and relating to people" (Id. at ¶11) However, areas where Jacquet performed his duties effectively were also noted.

At the conclusion of the eight-week FTP, Jacquet was the only one in his class to have his FTP extended by the Department. The extension was recommended by Lieutenant Vivolo. It had previously been recommended by Van Nostrand in emails to Vivolo and Deputy Chief Carrabino. In recommending the extension, Van Nostrand wrote:

2

> This is my first trainee I have had full time, and maybe there is something different that can be done differently to get through to him. Maybe there is a more experienced FTO who could give you a second opinion.

(E-mail from Van Nostrand to Lieutenant Vivolo, Ex. 8 (dkt. no. 42-8).) Van Nostrand was not involved with Jacquet's extended training.

During his extended FTP, Jacquet was evaluated by a number of other officers. Officer Patrick Canty noted some positive qualities but also reported to Deputy Chief Carrabino that Jacquet was "super slow, hesitant at making a decision, felt more comfortable being told what to do, takes a long time writing reports, over thinks, afraid to make a mistake." (E-mail from Patrick Canty to Stephen Carrabino, Ex. 11 (dkt. no. 42-11).) Officer Eduardo Soares reported:

> The issues I have noticed are the unreasonable amount of time it takes to file simple reports. The lack of confidence when dealing with the public on calls, he has also advised people incorrectly, he appears confused at times on calls, he is unsure of his arrest powers, and my biggest issues I had with him were a few calls where officer safety was not exercised.

(E-mail from Eduardo Soares to Stephen Carrabino, Ex. 12 (dkt. no. 42-12).) Officer Michael Perrone's report to Deputy Chief Carrabino cited both positive and negative attributes and concluded:

> I am unable to recommend that he be assigned to a patrol division when the 2016 assignments take effect. . . . In my opinion he needs further training to develop the necessary skills to operate on his own.

(Letter from Michael Perrone to Stephen Carrabino, Ex. 13 at 1-2 (dkt. no 42-13).) In an email to Chief David Fallon, Carrabino summarized that "the bottom line right now is that Officer Jacquet is not safe to be on his own." (E-mail from Stephen Carrabion to David Fallon, Ex. 14 (dkt. no. 42-14).) The record contains other similar evaluations, but it is not necessary to catalog them all.

At the end of Jacquet's extended FTP, Deputy Chief Carrabino met with him to informally relieve him of his duties. Carrabino noted in an email to Department Chief David Fallon that "the extra four weeks of training did not resolve [Jacquet's] problems" and that he "does not have the

3

requisite skills to be a police officer" in Somerville. (E-mail from Stephen Carrabino to David Fallon, Ex. 16 at 1–2 (dkt. no. 42-16).) On March 2, 2016, Chief Fallon sent Jacquet a notice terminating his probationary employment.

Another black officer in Jacquet's training class completed the training and became a permanent employee of the Department.

## II.   Discussion

"Summary judgment is appropriate where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Audette v. Town of Plymouth, MA, 858 F.3d 13, 19 (1st Cir. 2017) (quoting Mulloy v. Acushnet Co., 460 F.3d 141, 145 (1st Cir. 2006)). Although the record is construed in a light most favorable to the non-moving party, the Court need not consider "conclusory allegations, improbable inferences, [or] unsupported speculation." Mulloy, 460 F.3d at 145 (quotation omitted).

### A.   Employment Discrimination (Counts I and III)

Counts I and III allege that the City discriminated against Jacquet by extending his field training and terminating his employment based on his race. There is no direct evidence of racial discrimination here. Therefore, to make out such a claim of employment discrimination under either Title VII or Mass. Gen. Laws ch. 151B, the familiar McDonnel Douglas burden-shifting framework applies. See McDonnell Douglas Corp. v Green, 411 U.S. 792 (1973); accord Wheelock Coll. v. Mass. Comm'n Against Discrimination, 355 N.E.2d 309, 314 (Mass. 1976).[2]

---

[2] Chapter 151B is Massachusetts's analog to Title VII's discrimination and retaliation bar. See Billings v. Town of Grafton, 515 F.3d 39, 47 n. 6 (1st Cir. 2008). "As neither party has identified meaningful distinctions between Title VII and Chapter 151B that would affect the outcome here,

Jacquet must first establish a prima facie case of discrimination. See Bhatti v. Tr. of Boston Univ., 659 F.3d 64, 70 (1st Cir. 2011). The defendant then has the burden of articulating a legitimate, nondiscriminatory reason for the adverse employment action. Cherkaoui v. City of Quincy, 877 F.3d 14, 24 (1st Cir. 2017). If the defendant carries that burden the plaintiff must then show that the proffered reason is a pretext and that the true reason for the adverse employment action was discriminatory. See id. (quotation omitted).

A prima facie case is "a small showing that is not onerous and is easily made." Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003) (internal quotation and citations omitted). For purposes of this motion, it may be assumed that a prima facie case has been established. The City, in turn, has articulated legitimate nondiscriminatory reasons for the extension of Jacquet's training and his eventual termination, and has supported that showing through evidence that is not subject to genuine dispute.

Jacquet has failed to "offer 'some minimally sufficient evidence, direct or indirect, both of pretext and of [the defendant's] discriminatory animus." Pearson v. Massachusetts Bay Transp. Auth., 723 F.3d 36, 40–41 (1st Cir. 2013) (quoting Acevedo–Parrilla v. Novartis Ex–Lax, Inc., 696 F.3d 128, 140 (1st Cir. 2012)). The FTOs that were assigned to observe Jacquet independently expressed similar positives and negatives in their reviews of Jacquet. The concerns regarding safety and his insufficient demonstration of command presence were consistently expressed by trainers throughout his FTP, both initial and extended. The City also asserts persuasively that the extension of Jacquet's field training was not adverse to him, but rather was an opportunity to provide him additional time to improve. His subsequent termination was the result of his failure to

---

we do not provide separate analysis for the [] claims" Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 n.9 (1st Cir. 2016).

show improvement in the identified areas of concern. Jacquet has not produced specific evidence rising to a triable dispute that there was pretext in the decision to either extend his FTP or to terminate his employment.

Nor is there adequate evidence to support a claim that he had been subjected to a hostile work environment. To prove a hostile work environment claim, "a plaintiff must show that [he] was subjected to severe or pervasive harassment that materially altered the conditions of [his] employment. Noviello v. City of Bos., 398 F.3d 76, 92 (1st Cir. 2005). The "harassment must be 'objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" Id. (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998)). "[A] court must mull the totality of the circumstances, including factors such as the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an with an employee's work performance." Id. (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). Where the person responsible for creating a hostile work environment is not a supervisor, the employee must show "that the employer knew or should have known about the harassment, yet failed to take prompt action to stop it." Id. at 96–97. Jacquet offers evidence that Van Nostrand on several occasions made racially insensitive remarks about the public and about Jacquet and other minority officers. But the remarks he points to fall within the category of "stray remarks." "A 'stray remark' is a statement that, while on its face appears to suggest bias, is not temporally or causally connected to the challenged employment decision and thus not probative of discriminatory animus." Barry v. Moran, 661 F.3d 696, 707 (1st Cir. 2011) (quoting Meléndez v. Autogermana, Inc., 622 F.3d 46, 54–55 (1st Cir. 2010)). Stray remarks "normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus."

Mélendez, 622 F.3d at 54 (quoting González v. El Día, Inc., 304 F.3d 63, 69 (1st Cir. 2002)). Jacquet "has failed to adduce sufficient evidence for a reasonable trier of fact to conclude that the remarks were both temporally and causally connected to [the City's] decision to discharge him." Id.

### B. Counts II and IV – Retaliation

Counts II and IV allege that the defendant retaliated against Jacquet in violation of Mass. Gen. Laws ch. 151B and Title VII by extending his field training and then terminating his employment. Chapter 151B and Title VII both prohibit employers from "retaliat[ing] against persons who complain about unlawfully discriminatory employment practices." Noviello, 398 F.3d at 88 (citing 42 U.S.C. § 2000e–3(a); Mass. Gen. Laws ch. 151B, § 4(4)). To establish a prima facie case for retaliation under either statute, the plaintiff must show that (1) he engaged in protected conduct; (2) he suffered an adverse employment action; and (3) there was a causal connection between the conduct and adverse employment action. See Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 218-219 (1st Cir. 2016) (citing Noviello, 398 F.3d at 88). "Moreover, under Chapter VII (and likely under Chapter 151B as well), subjecting an employee to a hostile work environment can constitute an adverse employment action for purposes of a retaliation claim." Posada v. ACP Facility Servs., Inc., 389 F. Supp. 3d 149, 158 (D. Mass. 2019) (citing Noviello, 398 F.3d at 89-91).

Protected activity includes not only the filing of formal charges of discrimination but also "informal protests of discriminatory employment practices, including making complaints to management . . . ." Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009) (quoting Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2nd Cir. 1990)). Jacquet has failed to produce evidence showing he engaged in protected activity or that there is a causal connection between any protected

conduct and adverse employment actions. Moreover, the extension of his FTE was not adverse but rather favorable to him. It gave him a second chance to prove himself. Based on the evaluations of his performance in the first phase of training in the record from a number of sources, it appears likely that his provisional employment could have been terminated after that phase. The extension was intended for his benefit.

        C.        Count V – Interference with Right to be Free of Discrimination

Jacquet alleges that the defendant "coerced, intimidated, threatened, or interfered with the Plaintiff's enjoyment of the right to be free of unlawful discrimination and acted in deliberate disregard of the Plaintiff's rights, in violation of Mass. Gen. Laws. ch. 151B §§ 4(4A)." (Compl. at ¶ 49 (dkt. no. 1-1).) There is no question that [§ 4(4A)] prohibits interference with an employee's right to work in an environment free of unlawful . . . discrimination." McLaughlin v. City of Lowell, 992 N.E.2d 1036, 1057 (Mass. 2013). Here, both parties present their arguments regarding the § 4(4A) claim in mostly the footnotes of their memoranda. The record simply does not contain admissible evidence of "deliberate disregard" of Jacquet's rights. It actually supports an opposite conclusion. Several different evaluators reported concerns about Jacquet's performance. There is no evidence that their reports were anything but independent evaluations by the respective training officers. Is it possible that in a workplace there could be a conspiratorial cabal to gang up on an employee because of racial bias? Of course it is possible, which is why statutes like § 4(4A) are justified. But there is simply no evidence of such an occurrence in the record before the Court.

### **III.**     **Conclusion**

For the foregoing reasons, the Motion for Summary Judgment (dkt. no. 40) is GRANTED as to all counts at issue, and judgment shall enter in favor of the City of Somerville.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
Senior United States District Judge
